UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
(at Covington)

| | | |
|---|---|---|
| WILD FLAVORS, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 2: 24-006-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| WAUSAU UNDERWRITERS | ) | **MEMORANDUM OPINION** |
| INSURANCE COMPANY, et al., | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |

\*\*\*    \*\*\*    \*\*\*    \*\*\*

This matter is pending for consideration of Plaintiff WILD Flavors, Inc. ("WILD") and Agrinational Insurance Company's ("Agrinational") motion for partial summary judgment [Record No. 67], Defendant Allied World National Assurance Company's ("AWNAC") motion for summary judgment [Record No. 115], and Defendant Wausau Underwriters Insurance Company's ("Wausau") motion for summary judgment [Record No. 121]. Having carefully reviewed the record, the parties' briefs, and relevant case law, the Court reaches the following conclusions: (a) there was only one occurrence; (b) the "damage first occurring" exclusion does not apply; and (c) Wausau breached its duty to defend WILD.

The Court will exercise declaratory jurisdiction over all claims, including against AWNAC. Finally, the Court will require additional briefing regarding the following issues:

(1) Does Kentucky law mandate a complete waiver of any challenges to underlying defense costs when an insurer breaches its duty to defend, and, if not, which costs are reasonable here?

(2)  Under an "actual liability" indemnity standard of the insurance agreements, and a continuous trigger of coverage, which settlements and costs must be indemnified?

## I.  Background

This insurance coverage dispute concerns numerous underlying lawsuits (the "underlying actions") filed against WILD and stemming from its manufacture and distribution of food flavoring products containing allegedly toxic chemicals called diketones, and diacetyl. [Record No. 80, p. 3] Beginning in 2005, WILD has been named in lawsuits filed by 220 claimants who contend that exposure to its flavoring products caused "severe, permanent, and progressive pulmonary injury."  [Record No. 69-1] WILD settled many of these claims and has incurred substantial costs through their defense and resolution.  WILD also purchased policies from Federal Insurance Company ("Federal"), Landmark American Insurance Company ("Landmark"), and HDI-Gerling America Insurance Company ("HDI").  WILD states that these insurers have accepted coverage and now participate in WILD's settlement and defense under substantially similar policy terms; however, Wausau declined to defend or indemnify WILD.  [Record No. 169, p. 169]

WILD and Agrinational argue that Wausau was required to defend and indemnify WILD in connection with the underlying actions.  The Complaint seeks declaratory judgments against Wausau (Count I), and Employers and Allied World (Count II), and includes claims against Wausau for breach of contract (Count III), contribution (Count IV), statutory bad faith under KUCSPA (Count V), and common law bad faith (Count VI).  Agrinational contends it is entitled to contribution, indemnification, subrogation, and reimbursement from Wausau for the payments Agrinational has made in alleged satisfaction of Wausau's obligation to defend and indemnify WILD.  The defendants later filed a Counterclaim seeking a similar declaratory

judgment concerning their defense and indemnity obligations to WILD under Wausau's CGL policies.  [Record No. 24]

The Court granted Wausau's motion to bifurcate the action earlier in the case, staying discovery on the bad faith claims pending a decision on the declaratory and breach of contract claims.  [Record No. 41] On April 18, 2025, WILD and Agrinational moved for partial summary judgment on the issue of Wausau's duty to defend WILD in the underlying actions. [Record No. 67] Wausau filed a response in opposition, and WILD and Agrinational filed a reply.  [Record Nos. 80 and 91] Then, on August 20, 2025, Wausau and AWNAC filed separate motions for summary judgment on the declaratory and breach of contract claims regarding Wausau's duty to indemnify.  [Record Nos.  113 and 122] WILD Flavors and Agrinational filed responses in opposition, and both Wausau and AWNAC filed replies in support.  [Record Nos. 168, 169, 170, 174] The questions the Court faces are mostly legal in nature, but a few issues will survive summary judgment.

## II.  The Summary Judgment Standard

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  *Walden v. Gen. Elec. Int'l, Inc*, 119 F.4th 1049, 1056 (6th Cir. 2024) (citing Fed. R. Civ. P. 56(a)).  To meet this standard, a movant must show that the nonmoving party has failed to produce evidence to support at least one essential element of his or her claim.  *See Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (citations omitted)).  If the moving party satisfies this burden, the opposing party must present "significant probative evidence that establishes more than some metaphysical doubt as to the

material facts." *Golden v. Mirabile Invest. Corp.*, 724 F. App'x 441, 445 (6th Cir. 2018) (citation and alteration omitted).

The Court views the "evidence in the light most favorable to the nonmoving party." *Lang v. City of Kalamazoo*, 744 F. App'x 282, 285 (6th Cir. 2018) (citing *Himmel v. Ford Motor Co.*, 342 F.3d 593, 598 (6th Cir. 2003). However, it does not weigh the evidence or make credibility determinations. Instead, the Court determines "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

### III. Motion for Partial Summary Judgment on Duty to Defend

Interpretation and construction of an insurance contract are matters of law for the Court under Kentucky law. *Kemper Nat. Ins. Cos. v. Heaven Hill Distilleries*, *Inc.*, 82 S.W.3d 869, 871 (Ky. 2002). Further, an insurance contract should be read "according to its plain meaning, its true character and purpose, and the intent of the policies." *Liberty Corporate Capital Ltd. v. Security Safe Outlet, Inc.*, 937 F. Supp. 2d 891, 898 (E.D. Ky. 2013). And when the language of an insurance contract is ambiguous or self-contradictory, it is construed *in favor of the insured*. *Id.* at 897 (citing *Eyler v. Nationwide Mut. Fire Ins. Co.*, 824 S.W.2d 855, 859-60 (Ky. 1992)). However, the Court will not create an ambiguity where there is none so that it may resolve a dispute in the insured's favor. *See id.* at 898. Finally, "[w]hen analyzing challenged terms for clarity … the terms of insurance contracts have no technical legal meanings and must be reasonably interpreted as they would be understood by a lay reader." *Thomas v. State Farm Fire & Cas. Co.*, 626 S.W.3d 504, 507 (Ky. 2021).

-4-

An insurer's duty to defend is broader than—and distinct from—its duty to indemnify. *Wolford v. Wolford*, 662 S.W.2d 835, 838 (Ky. 1984). Normally, an insurer "has a duty to defend if there is any allegation which potentially, possibly or might come within the coverage of the policy." *James Graham Brown Found., Inc. v. St. Paul Fire & Marine Ins. Co.*, 814 S.W.2d 273, 279 (Ky. 1991) (citing *O'Bannon v. Aetna Casualty and Surety Company,* 678 S.W.2d 390 (Ky. 1984)). And, as a general rule, "a court should determine at the outset of litigation whether an insurance company has a duty to defend its insured by comparing the allegations in the underlying complaint with the terms of the insurance policy." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 507 (6th Cir. 2003) (citing *DiBeneditto v. Med. Protective Co.,* 3 F. App'x 483, 485 (6th Cir. 2001)).

## A.    Occurrences and SIRS

The parties' core dispute turns on the interpretation of "occurrence" under the applicable policies. The policies define an occurrence "as an 'accident, including continuous or repeated exposure to substantially the same general harmful conditions.'" [Record No. 70 at 2] WILD and Agrinational argue that the underlying actions arise from one occurrence: the manufacture of flavorings containing potentially harmful diketones. Conversely, Wausau asserts that each shipment of flavorings constitutes a separate occurrence. Unsurprisingly, the conclusions of each respective "occurrence" theory beget opposite outcomes on WILD's entitlement to coverage and defense. This definition of "occurrence" is dispositive because of self-insured retentions ("SIR") built into the insurance contracts.

As the undersigned explained previously, "the SIR is a species of deductible, or a minimum payment required from an insured before it is entitled to defense by its insurer." [Record No. 79, p. 4] Each "[s]elf-insured retention … [a]pplies to all 'bodily injury' and

'property damage' caused by an 'occurrence' and '[i]s the amount you will pay for any one 'occurrence' regardless of the number of insureds, claims or 'suits' brought or persons or organizations making claims or bringing 'suits.'"    [Record No. 80 at 5] "[T]he 'policy incorporates a 'self-insured retention' which must be satisfied before coverage is afforded.' The amount of the SIR on each of the Wausau Policies is $100,000." [*Id.* (emphasis removed)]

The parties agree that a separate SIR must be paid before defense or coverage is triggered for each occurrence. But their interpretations diverge regarding the method by which the Court should determine the number of occurrences and, by extension, the applicable number of SIRs.

## Kentucky Law on Occurrences

Kentucky courts have adopted the "cause test." *See, e.g.*, *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56, 61 (3d Cir. 1982) ("Using this analysis, the court asks if there was but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage.") (citation modified). But in jurisdictions across the nation, the "cause" test results in a different, favorable outcome depending on who applies it. If the cause test were truly dispositive, that should not be possible. So, perhaps the variance in outcomes stems from its incorrect application. Or alternatively, it is possible the test itself is non dispositive. In any event, the Kentucky cases in which it has been applied (a nightclub altercation and an infant's death after choking on a push pin) present starkly different facts than those of this case.

*Hancock*

Courts within the Commonwealth first applied the "cause test" in *Cont'l Ins. Companies v. Hancock*, 507 S.W.2d 146, 147 (Ky. 1973).[1]  The case involved a series of scuffles at a nightclub.  Although there were at least two contentious encounters between staff and patrons of the club, the court of appeals reversed the trial court's determination that there were two occurrences.  *Id.* at 552 ("[T]he facts of this case established that there was only one occurrence and the holding of the trial court to the contrary was clearly erroneous.").  This determination relied on the applicable liability policy's definition of "occurrence." Specifically, the policy prescribed that "bodily injury arising out of continuous exposure to substantially the same general conditions shall be considered as arising out of one occurrence." *Id.* (citation modified).

*Davis*

In 2016, the Court of Appeals of Kentucky (at that time, Kentucky's intermediate appellate court) clarified that the "cause" test had been applied in *Hancock*, and that test was the proper methodology in evaluating the number of occurrences going forward.  *Davis v. Ky. Farm Bureau Mut. Ins. Co.*, 495 S.W.3d 159, 163 (Ky. Ct. App. 2016) ("The parties agree that Kentucky's then Supreme Court adopted the cause approach in *Continental Ins. Cos. v. Hancock,* 507 S.W.2d 146 (Ky. 1973), where the Court held despite that there were multiple tortfeasors and injured parties, there was nevertheless a single occurrence.").

---

[1]    *Handcock* was decided by the Court of Appeals of Kentucky which, at the time, was Kentucky's highest appellate Court. The Supreme Court of Kentucky was established in 1975 by a constitutional amendment which took effect in 1976, creating Kentucky's unified court system. With the 1975 amendment, the Court of Appeals of Kentucky because the Commonwealth's intermediate appellate court.

**Sixth Circuit Authority**

The United States Court of Appeals for the Sixth Circuit has only once determined the applicable number of occurrences in a similar case.  However, the case is not binding here for three reasons.  First, the Sixth Circuit applied a different variant of the "cause" test than the approach endorsed under Kentucky law.  Second, the Sixth Circuit applied Illinois law.  Third, a few crucial factual distinctions separate it from this case.

*Michigan Chemical*

At first glance, it may seem that all roads lead back to *Mich. Chem. Corp. v. Am. Home Assurance Co.*, 728 F.2d 374, 375 (6th Cir. 1984).  *Michigan Chemical* was a landmark insurance coverage dispute that turned on the definition of an "occurrence" (and consequently, how many transpired) under several liability indemnity insurance policies.  After a district court in the Western District of Michigan held that the definition of occurrence was ambiguous and construed it against the defendant insurers, the insurers filed an interlocutory appeal challenging the district court's holding.

The dispute concerned Michigan Chemical Company's ("MCC") manufacture and shipment of various chemical compounds.  Relevant to the dispute, and among other things, MCC manufactured a magnesium-oxide additive for livestock feed and a commercial flame retardant "which contained the toxin polybrominated biphenyl ("PBB").  These substances were packaged in nearly identical brown fifty-pound bags.  The sole difference between the magnesium oxide and PBB bags was the stenciled trade names of the respective products, 'Nutrimaster' and 'Firemaster.'"  *Id.* at 376.  MCC accidentally shipped the toxic flame retardant to Farm Bureau Services which then "mixed the PBB with regular feed and sold the resulting product to dairy farmers."  *Id.*  "After Farm Bureau Services and state authorities

-8-

discovered that the feed was contaminated, 28,679 cattle, 4,612 swine, 1,399 sheep and over 6,000 chickens and other farm animals were destroyed.  Their owners filed hundreds of claims against MCC and Farm Bureau Services." *Id.*

The applicable policy provided $28 million in coverage per occurrence, and up to two maximum occurrences.  The defendant insurers argued that the number of "occurrences" was defined by the number of mis-shipments, of which they contended there was only one. Conversely, the plaintiffs argued that the number of occurrences was equal to the number of claims, which exceeded one, and would allow a much greater recovery under the policy.  As an aside, the introduction of SIRs in this case leads the parties to take opposite positions from the *Michigan Chemical* parties, because more occurrences here result in less coverage.

To begin its analysis, the *Michigan Chemical* court concluded that the dispute was governed by Illinois law.  It next looked to the operative liability policy language, which is like the "occurrence" language in this case.  *Compare id.* at 378 ("'Occurrence' means… 1) an accident or 2) continuous or repeated exposure to conditions which results in injury … including consequential loss resulting therefrom ... [a]ll damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence.") *with*, [Record No. 70 at 2 (defining occurrence "as an 'accident, including continuous or repeated exposure to substantially the same general harmful conditions.'").] Notably, the Sixth Circuit only addressed the parties' arguments over the former definition: whether the contaminated feed event(s) fell under the former definition of "an accident." *Id.* at 379.

Similar to the proffered standard in this dispute, the *Michigan Chemical* court also adopted reasoning favored by "the vast majority of courts," holding that "although injury must

-9-

be suffered before an insured can be held liable, the number of occurrences for purposes of applying coverage limitations is determined by referring to the cause or causes of the damage and not to the number of injuries or claims." *Id.* It acknowledged that sitting in diversity required it to answer a question Illinois courts had not yet faced, stressing that "if the Illinois courts were presented with the current case, they would follow the overwhelming majority of decisions which have held that the number of occurrences is determined by examining the cause or causes of the damage." *Id.* at 381. From there, the Sixth Circuit held that, "under the language of these contracts, the number of occurrences must be determined by examining the cause of the property damage, *i.e.*, the mis-shipment or mis-shipments of PBB." *Id.* at 382.

Ostensibly, the *Michigan Chemical* court adopted the same "cause" test *both* sides urge the Court to espouse here. But under the surface, the "cause" test *Michigan Chemical* embraced was not the same as the "cause" test applied in many other jurisdictions. Perhaps this was because neither side argued that the true "cause" of the accident was the initial labeling of the two chemical compounds in nearly identical brown bags, arguably the *proximate* cause of the entire dilemma.[2] More confusingly, in the aftermath of *Michigan Chemical*, district courts within the Sixth Circuit rendered decisions roughly as consistent with its purported holding as a beginner's series of throws in a game of darts.

---

[2]      Courts have characterized MCC's shipment of "nearly identical brown fifty-pound bags" containing PBB instead of magnesium oxide as a "mislabeling." *See*, *e.g.*, *Mitsui Sumitomo Ins. Co. of Am. v. Duke Univ. Health Sys., Inc.*, 509 F. App'x 233, 238 (4th Cir. 2013) (referring to *Michigan Chemical's* similar labeling as "mislabeling"). The undersigned declines to adopt that language to describe the events in the case, because, although they were (strikingly) aesthetically similar, each bag nonetheless correctly bore "the stenciled trade names of the respective products, 'Nutrimaster' and 'Firemaster.'" *Michigan Chemical*, 728 F.2d at 376.

Some followed it obsequiously, while others have ignored or distinguished it. *See, e.g.*, *Stryker Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. 4: 01-CV-157, 2004 WL 7344207, at *4 (W.D. Mich. Aug. 27, 2004) (applying *Michigan Chemical's* liability event "cause" test variant where expired partial knee replacements were erroneously implanted into several patients); *Parker Hannifin Corp. v. Steadfast Ins. Co.*, 445 F. Supp. 2d 827, 831 (N.D. Ohio 2006) (applying Ohio law, finding single occurrence in product liability case rather than occurrences based on shipments despite acknowledging *Michigan Chemical*); *LuK Clutch Systems, LLC v. Century Indem. Co.*, 805 F. Supp. 2d 370 (N.D. Ohio 2011) (applying Ohio law, finding that asbestos claims against an insured constituted multiple occurrences with each claimant's exposure constituting a separate occurrence without reference to *Michigan Chemical*); *Associated Indem. Corp. v. Dow Chem. Co.*, 814 F. Supp. 613, 623 (E.D. Mich. 1993) (rejecting shipment theory and finding single occurrence without reference to *Michigan Chemical*).  So how then can courts uniformly apply the "cause" test, yet achieve diametrically opposite results?

Start with the Third Circuit's decision in *Appalachian Insurance Co. v. Liberty Mutual Insurance Co.,* 676 F.2d 56 (3d Cir. 1982).  *Appalachian* applied the "cause" test to underlying sex discrimination claims against Liberty Mutual Insurance Company.  Applying Massachusetts law, the Third Circuit found that "injuries for which Liberty was liable all resulted from a common source: Liberty's discriminatory employment policies." *Id.* at 61.  It reached this conclusion despite "[t]he fact that there were multiple injuries and that they were of different magnitudes and that injuries extended over a period of time," because "as long as

the injuries stem from one proximate cause there is a single occurrence." *Id.* (citation modified). *Appalachian* marked the delineation of the "proximate" cause test.[3]

Scholars have since contrasted *Appalachian* with *Michigan Chemical*, noting that the disparity between the two cases emphasizes a dispositive rift in the "cause" test. *Id.* Courts have since recognized that *Appalachian* applied a "proximate cause" variation, while *Michigan Chemical* applied a "liability event" formula. *See Mitsui Sumitomo*, 509 F. App'x 233 (explaining that in *Michigan Chemical*, "each shipment of toxic flame retardant that had been mislabeled as animal feed supplement qualified as a separate occurrence, even though the problem arose from a single event: the mislabeling itself." But in *Appalachian*, the court considered "an event to constitute one occurrence when 'there was but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage.'") (citation omitted).

Caught between these two starkly different "cause" tests, it is the undersigned's duty to faithfully apply Kentucky law, which means determining which test Kentucky state courts would endorse under these facts. WILD and Agrinational advocate for the "proximate cause" test, whereas Wausau insists on the "liability event" method. In the words of the *Michigan Chemical* court, the undersigned is "persuaded that if the [Commonwealth's] courts were presented with the current case, they would follow the overwhelming majority of decisions which have held that the number of occurrences is determined by examining the cause or causes of the damage." *Michigan Chemical*, 728 F.2d at 376. Here, the Court adopts the

---

[3]    *See* Michael Murray, *The Law of Describing Accidents: A New Proposal for Determining the Number of Occurrences in Insurance*, 118 Yale L.J. 1484, 1496 (2009) ("The leading case for the proximate cause variation is *Appalachian Insurance Co. v. Liberty Mutual Insurance Co.*").

proximate cause test—which means the harm was caused by a single occurrence—WILD's
manufacture of allegedly harmful flavorings.

Returning to *Davis* and *Hancock*, the Court recognizes that both applied a form of the
proximate cause test.  First, in *Hancock*, the court evaluated with two distinct "incidents."
First, one of the plaintiffs (Larry Chism) "insulted one of the waitresses in the establishment
and was asked to leave by Simpson [the nightclub owner.]"  507 S.W.2d at 148.  "Simpson
tore Chism's shirt and forced him to leave the premises."  *Id.*  "Simpson later went outside and
some further recrimination took place[,] … Simpson went back into the nightclub, there is
some testimony he called for help, and presently three of his employees came outside and a
fight promptly ensued between the three employees and Hancock, Chism and Wilburn
[Chism's friends.]"  *Id.*

Under the "liability event" "cause" test developed in *Michigan Chemical*, just as each
of WILD's shipments to a manufacturing facility would constitute an occurrence, it follows
that each physical assault of the *Hancock* plaintiffs would similarly amount to a separate
occurrence.  However, the Court of Appeals of Kentucky rejected this notion.  *See id.* at 152
(finding bodily injury arising out of continuous exposure to substantially the same general
conditions was demonstrated, thus "the facts of this case established that there was only one
occurrence").

*Davis* addressed a different situation.  Rather than accumulating *multiple* incidents into
one occurrence, the court clarified that multiple *acts of negligence* that compose an individual
injury also result in a sole occurrence.  This approach is confirmed by several other "cause
test" courts facing similar facts and finding one occurrence in the context of a product a
company did not yet know was faulty.  *See Parker Hannifin*, 445 F. Supp. 2d 827 (defective

-13-

gasket sold throughout United States) and *Dow Chemical*, 814 F. Supp. at 623 (endorsing single occurrence after production of defective resin). In contrast, many of the cases provided by Wausau involve faulty products that were erroneously *shipped* or are otherwise distinguishable. *See Michigan Chemical*, 728 F.2d 374 (although bags of PBB and magnesium oxide were labeled *similarly*, MCC shipped bags with the wrong labels to the wrong customer); *Stryker Corp*, 2004 WL 7344207 (expired partial knee replacements not intended for distribution were erroneously implanted into several patients in one-off event); *Big Lots Stores, Inc. v. Am. Guar. & Liab. Ins. Co.*, 240 F. Supp. 3d 725, 734 (S.D. Ohio 2017) (Big Lots was responsible for shipping, not manufacturing, the products).

Here, WILD produced flavorings with allegedly harmful diketones, but the shipments were not the proximate cause of the underlying plaintiff's harms. At heart, the underlying issue is one of an alleged large-scale manufacturing defect, rather than the erroneous shipment of a limited quantity of faulty batches. Under these facts, diketone exposure is more similar to asbestos cases than a distributor forwarding products it did not manufacture, or a mis-shipment of an otherwise normal product. *See, e.g.*, *United Conveyor Corp. v. Allstate Ins. Co.*, 92 N.E.3d 561, 564 (Ill. App. 2017) ("The single, unitary cause of claims against United is the fact that it incorporated asbestos-containing components or products into each of its systems designed for high-heat operations … the cause of its loss was not attributable to the installation and maintenance by United's customers of each conveyor system[.]"). For those reasons, application of Kentucky's cause test leads to one significant conclusion: there was only one occurrence and, by extension, only one SIR needed to be exhausted.

### B.   "Damage Occurring First" Exclusion

Wausau and AWNAC both argue that the "damage occurring first" exclusion precludes many of WILD's claims for reimbursement.  The exclusion provides that "[t]his insurance does not apply to 'bodily injury' or 'property damage' within the 'products-completed operations hazard' if the injury or damage *first occurred prior to the effective date of this policy*."  [Record No. 70-5, p. 77 (emphasis added)] WILD and Agrinational contend that the exclusion does not preclude exposure to WILD's flavorings that began before the Wausau and AWNAC policies were effective because the alleged injuries in the underlying suits are progressive.  Wausau and AWNAC urge the Court to adopt an interpretation of the exclusion that would preclude coverage in all cases in which individuals were exposed prior to its policy dates.

In Kentucky, "where the terms of an insurance policy are clear and unambiguous, the policy will be enforced as written." *Heaven Hill Distilleries*, *Inc.*, 82 S.W.3d 869, 873 (*quoting American National Bank and Trust Company v. Hartford Accident and Indemnity Company,* 442 F.2d 995, 999 (6th Cir. 1971) (citation modified).  However, because "coverage exclusions are contrary to the fundamental protective purpose of insurance, they are strictly construed against the insurer and will not be extended beyond their clear and unequivocal meaning.  But that strict construction should not overcome plain, clear language resulting in a strained or forced construction." *Id.* (citation and quotations omitted).

Wausau argues that, in similar cases, courts have construed the "damage first occurring" exclusion to preclude damages that originated before applicable coverage periods. Specifically, it points to *Evanston Ins. Co. v. DCM Contracting, Inc.*, 441 F.Supp. 3d 1336 (N.D. Ga. 2020), *Williams Consol. I, Ltd./BSI Holdings, Inc. v. TIG Ins. Co.*, 230 S.W.2d 895

(Tex. App. 2007), and *USF Ins. Co. v. Clarendon Am. Ins. Co.*, 452 F.Supp. 2d 972 (C.D. Cal. 2006).

> In *Evanston*, the relevant exclusion barred coverage for damage that:
>
> (1) First occurred, first began to occur, or is alleged to have first occurred;
> (2) Is alleged to be in the process of occurring to any degree; or
> (3) Is caused by or alleged to have been caused by incremental, continuous or progressive injury or damage arising from an "occurrence" or offense which first occurred, began to occur, or is alleged to have first occurred, prior to the effective date of this policy.

441 F.Supp. 3d at 1340. And here, the exclusion merely purports to limit injuries that "first occurred prior to the effective date of this policy."

*Williams* also addressed much broader exclusionary language. *See* 230 S.W.2d 895 (barring coverage for harm "which has first occurred or begun prior to the effective date of this policy, regardless of whether *repeated or continued exposure to conditions* which were a cause of such [harm] ... occurs during the period of this policy and *cause [sic] additional, progressive or further ..."* harm) (emphasis added).

And finally, *Clarendon* evaluated an exclusion in a contract that stated injury "shall be deemed to take place at the time of the first such damage, even though the nature and extent of such damage or injury may change and even though the damage may be continuous, progressive, cumulative, changing or evolving[.]" 452 F.Supp. 2d at 983. The broader nature of each exclusion explains why those courts held they applied.

Arguing for the same application of the exclusion as Wausau, AWNAC cites *Atl. Cas. Ins. Co. v. Garcia*, 878 F.3d 566 (7th Cir. 2017), and *James River Cas. Co. v. UniControl, Inc.*, No. 22-3721, 2023 WL 4543487, (6th Cir. July 14, 2023). But for similar reasons, these cases also miss the mark. In addition to incorporating language barring coverage for harm "which

-16-

first occurred prior to the inception date of this policy," the *Garcia* policy *also* precluded harm "which is, or is alleged to be, in the process of occurring as of the inception date of this policy." 878 F.3d at 568.  This is, again, an especially salient difference considering the "progressive" nature of the harm alleged in the underlying actions here.  And AWNAC's attempt to analogize *Unicontrol* to this case fails because the pertinent exclusion nearly mirrors the expansive language in *Clarendon*.  *See* 2023 WL 4543487 at *1 (no coverage for damage "which begins or takes place before the inception date of coverage … even though the nature and extent of such damage or injury may change and even though the damage may be continuous, progressive, cumulative, changing or evolving").

Wausau asserts that, at the minimum, under the exclusion the exposure period should end "no later than the last date of the claimant's employment—not when injury manifests or a lawsuit is filed."  [Record No. 80, p.  24 n.14]  For example, if a plaintiff worked at a factory with WILD's flavoring products from 2001-2005, even if the injury is progressive, allocating damages to the 2010-2012 policy periods (those years with policies including the exclusion) would be unreasonable.  And under the same premise, if a plaintiff hypothetically worked at a factory from 2001-2005 that received a flavoring shipment from WILD in 2007, the exclusion would apply.  While this interpretation is more reasonable than precluding coverage for any plaintiff who was even once exposed to diketones before the exclusion period, it still does not comport with the progressive nature of the underlying harm alleged.

In *Aetna Cas. & Sur. Co. v. Com.*, 179 S.W.3d 830, 841 (Ky. 2005), *as modified on reh'g* (Jan. 19, 2006), the Supreme Court of Kentucky endorsed an approach allowing for pro-rated coverage over several periods when low level radioactive waste caused continuous property damage.  WILD and Agrinational contend that, based on this precedent, the narrow

-17-

exclusion here cannot be applied to the underlying harm, because it is similarly progressive. They essentially argue that injury cannot have "first occurred" before a given policy period if it is still in the process of occurring. They also cite cases from New Jersey in which exclusions were rejected by courts in progressive injury cases. *See Spaulding Composites Co. v. Aetna Cas. & Sur. Co.*, 819 A.2d 410, 412 (N.J. 2003) (rejecting "non-cumulation" clause that would have precluded "continuous trigger" coverage).

But the exclusion in *Spaulding* is also broader, and the undersigned declines to nullify the present exclusion as an "escape" clause. It makes more sense to conclude that the "damage occurring first" exclusion in this case does not apply here. It is ambiguous, and for plaintiffs with progressive pulmonary issues, cannot be said to complete "occurring" at a given point after exposure. Lastly, had Wausau intended to bar progressive injuries like the ones in the underlying complaint, it could have drafted the policy in a way that swept in progressive injury. For these reasons, the exclusion does not apply.

### Defense Costs

"If the insurer believes there is no coverage, it has several options. One is to defend the claim anyway, while preserving by a reservation of rights letter its right to challenge the coverage at a later date. Another is to elect not to defend." *Aetna Cas. & Sur. Co. v. Com.*, 179 S.W.3d 830, 841 (Ky. 2005), *as modified on reh'g* (Jan. 19, 2006). But if an insurance chooses the latter, and coverage is found, it "will be liable for 'all damages naturally flowing from' the failure to provide a defense." *Id.* (quoting *Eskridge v. Educator and Executive Insurers, Inc.,* 677 S.W.2d 887 (Ky.1984)).

In a footnote, Wausau contends that even if it breached its duty to defend, summary judgment on WILD's defense costs is precluded, because whether WILD's defense costs were

reasonable is a question of fact.   [Record No. 80, p. 25 n.15] Conversely, WILD and Agrinational argue that if Wausau breached its duty to defend, WILD's defense fees are reasonable as a matter of law.  This is evidently true in Michigan; *see Alticor Global holdings, Inc. v. Am. Int'l Specialty Lines Ins. Co*., 584 F.Supp.3d 453, 467 (W.D. Mich. 2022) ("as a consequence of an insurer's decision not to defend an insured, 'the settlements and defense costs for the underlying lawsuits are presumed reasonable,' and the insurer has the burden of proving that the costs are unreasonable.").  But what about Kentucky?

At least one federal court has held that even after an insurer breaches its duty to defend, "[t]he proper amount of defense costs is an issue that must be determined by a jury."  *The Point/Arc of N. Kentucky, Inc. v. Philadelphia Indem. Ins. Co.*, 154 F. Supp. 3d 503, 507 (E.D. Ky. 2015).  And while some courts within this district have adopted this reasoning, the Sixth Circuit has not yet provided guidance on the issue (under Kentucky law).  At the same time, allowing Wausau to retroactively challenge WILD's defense fees seems to contradict longstanding conceptions of the scope of the duty to defend and courts' unique expertise in the realm of attorney costs.

Further, state cases from within this Commonwealth appear to bolster the conclusion that allowing an insurer to relitigate its insured's defense does not comport with traditional notions of fairness.  *See Cincinnati Ins. Co. v. Vance*, 730 S.W.2d 521, 522 (Ky. 1987) ("We hold that the insurance company, at its own peril, may elect not to defend the original action against a putative insured, although thereafter it may be liable for the judgment if it is judicially determined that the policy did in fact provide coverage in the circumstances."); *Kentucky Ass'n of Cntys. All Lines Fund v. City of Somerset*, No. 2024-CA-0426-MR, 2025 WL 1909349, at *10 (Ky. Ct. App. July 11, 2025) ("Instead of defending Somerset under reservation of rights

… KALF, to its peril, pursued litigation on the issue of liability.  As a result, Somerset incurred attorneys' fees in defense of KALF's lawsuit … the Trial Court … may award Somerset the attorneys' fees that it determines to be reasonable.").  However, out of an abundance of caution, the Court will direct the parties to further brief the issue after having decided there was only one occurrence and that the exclusion discussed above does not apply.  The parties should explain whether Kentucky law requires a complete waiver of any challenge to defense costs when an insurer breaches its duty to defend and, if not, which costs are reasonable in this case.

## IV.  Duty to Indemnify

To recover in indemnity for a settlement and demonstrate an "enforceable claim," the insured must "show that it could have been held liable in the [underlying litigation] for a covered claim if there had not been a settlement."  *Louisville Galleria, LLC v. Philadelphia Indem. Ins. Co.*, 593 F. Supp. 3d 637, 652 (W.D. Ky. 2022).  Further, "Kentucky courts have held that insurers can avoid paying for their insured's voluntary settlements if the insurance contract limits coverage to cases in which the insured is actually liable."  *Martin Cnty. Coal Corp. v. Universal Underwriters Ins. Servs., Inc.*, 792 F. Supp. 2d 958, 960 (E.D. Ky. 2011), *aff'd sub nom. Martin Cnty. Coal Corp. v. Universal Underwriters Ins. Co.*, 727 F.3d 589 (6th Cir. 2013) (citing *Barnes v. Penn. Cas. Co.,* 306 Ky. 435, 208 S.W.2d 314, 316 (1948)).

### A.  Declaratory Judgment Jurisdiction (AWNAC)

AWNAC objects to an exercise of jurisdiction under the Declaratory Judgment Act with respect to its policy with WILD.  Because the focus of a significant other portion of this case concerns the Declaratory Judgment Act, the Court will address its decision to exercise jurisdiction there as well.

-20-

As an initial matter, AWNAC's principal argument that the "damage occurring first" exclusion applies was also raised by Wausau and addressed earlier in this opinion, and the exclusions are functionally identical. Accordingly, the Court's determination concerning the exclusion above will also apply to AWNAC for the reasons outlined below. But AWNAC's second argument is unique to its circumstances that do not apply to Wausau.

Under the Declaratory Judgment Act:

> [A]ny court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a). Courts within the Sixth Circuit employ a unique test to determine whether jurisdiction under the Act is appropriate. The following factors outlined in *Grand Trunk W. R.R. Co. v. Consol. Rail Corp.* serve as a guidepost:

> (1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata;" (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective.

746 F.2d 323, 326 (6th Cir. 1984). "[T]he *Grand Trunk* factors and their cousins in other circuits direct the district court to consider three things: efficiency, fairness, and federalism." *W. World Ins. Co. v. Hoey*, 773 F.3d 755, 759 (6th Cir. 2014) (citing *Sherwin–Williams Co. v. Holmes Cty.,* 343 F.3d 383, 390–91 (5th Cir. 2003)). "The relative weight of the underlying considerations of efficiency, fairness, and federalism will depend on facts of the case." *Id.* AWNAC's arguments primarily implicate the "efficiency" element; more specifically, AWNAC challenges justiciability.

-21-

### Factors One and Two

The first two *Grand Trunk* factors (*i.e.*, whether a declaratory action will settle the controversy and whether the action serves a useful purpose) favor the exercise of jurisdiction. "Because 'it is almost always the case that if a declaratory judgment will settle the controversy, ... it will clarify the legal relations in issue,' the inquiries required by these [first] two factors often overlap substantially." *United Specialty Ins. Co. v. Cole's Place, Inc.*, 936 F.3d 386, 397 (6th Cir. 2019) (quoting *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 557 (6th Cir. 2008).

"This is not a case where an insurance company brings a federal declaratory judgment action to clarify the scope of its policy despite the fact that the company is a party to a state-court lawsuit that will settle that very issue." *Scottsdale Ins. Co. v. Alley Trucking, LLC*, 2012 WL 13028143, at *2 (E.D. Ky. Nov. 9, 2012). In *Grand Trunk*, the Sixth Circuit held the first factor disfavored jurisdiction because a declaratory judgment would call into question an underlying state court's legal determination. 746 F.2d at 326. This case presents no such conflict. Here, the underlying controversy and the coverage dispute are separate, thus deciding the exclusion's applicability would not interfere with the underlying actions. But AWNAC raises a different concern.

It contends that exercising declaratory jurisdiction here is unhelpful because based on WILD's claim allocations, any chance of coverage under its 2011-2012 policy is allegedly theoretical at best. Specifically, it notes that "Wild was able to allocate less than $130,000 to the 2011-2012 policy year. Thus, even by Wild's standard, less than 13% of the underlying policy has been exhausted, and the AWNAC limit will never be reached." [Record No. 113, p. 7] However, WILD and Agrinational argue that even if the chance of coverage under the AWNAC policy is remote, a declaratory judgment would still serve a useful purpose in

-22-

clarifying the legal relations at stake. It also contends that a recent $58.6 million jury verdict in *James Graham v. Givaudan Flavors Corp.* "underscore[s] the risk profile of diketone exposure claims."[4] WILD was a defendant in that case but decided to settle its claims rather than proceed to trial.

To analogize, imagine AWNAC's policy (and corresponding $1,000,000 SIR) is an empty bucket on an island—one that must be filled completely with water before AWNAC is required to defend or indemnify WILD in any underlying action. AWNAC's bucket sits alongside at least 13 others based on WILD's claim allocation methodology. [*See* Record No. 113 at 8 ("Under Wild's allocation method, any indemnity for that claim would be spread out over at least 14 different policies.").] When WILD settles a lawsuit, (it rains), AWNAC's bucket fills up slightly, but because that rainwater (the settlement payout) is disseminated among at least 13 other buckets (and, in the context of this case, allocated to specific buckets based on several factors), AWNAC's bucket is filling up incredibly slowly. It notes that even after 20 years and 117 lawsuits "a trigger of the AWNAC policy [is] theoretical at best." [Record No. 113 at 2]

WILD does not dispute any of these underlying facts. Instead, it fears a tsunami, seeking assurance that if AWNAC's bucket were to fill up, it will still be covered. In the wake of the *Graham* verdict, WILD argues such a catastrophe is reasonably possible. It asserts that "[a] judgment less than half that size, even if prorated across every year of WILD's 22-year insurance program, would still exhaust the $1 million limit of the 2011–12 Wausau primary policy and trigger AWNAC's excess layer." [Record No. 168, p. 13] In this context, a

---

[4]    *Graham v. Givaudan Flavors Corp.*, No. 20-MM-CV0001, Circuit Court of Marion County, Missouri (Amended Judgment, December 31, 2024).

declaratory judgment will undoubtedly settle the controversy between the parties, which weighs positively towards the exercise of jurisdiction.

AWNAC disputes whether it will serve a useful purpose under the second *Grand Trunk* Factor. Although the possibility of another jury verdict is remote, it is possible. Further, outside the Sixth Circuit, "the worst case or highest estimate of damages may be used to ascertain whether or not a claim is justiciable against a particular excess insurer's policy." *Liberty Mut. Ins. Co. v. Lone Star Indus., Inc.*, 967 A.2d 1, 32 (Conn. 2009). For that reason, the first factor favors the exercise of exercise jurisdiction, because it will settle the controversy, and the second factor slightly favors exercising jurisdiction as well, even though the coverage may never be triggered.

### Factor Three

The third guidepost asks whether facts indicate there is a "race" for res judicata. The parties do not address this element. Further, it is unclear whether it applies in this case at all. WILD and Agrinational do not seek a declaratory judgment here to circumvent or preempt the determinations of another court. Further, adjudicating whether the same exclusion applies to both AWNAC and Wausau ensures a consistent result that may not be achieved if jurisdiction is declined. Accordingly, the third factor favors the exercise of jurisdiction due to a lack of procedural fencing.

### Factor Four

The fourth factor emphasizes the need to consider traditional notions of federalism (*i.e.*, the interplay between state and federal jurisdiction). Although the parties do not address it specifically, in the context of the broader dispute, this Court is asked to resolve novel questions under Kentucky law. That can weigh against a federal court's exercise of jurisdiction when

-24-

doing so may trample notions of federalism. *See, e.g., Bevidere Ins. Co. v. Triangle Enters.*, *Inc.*, No. 3:16-CV-00339-JHM, 2017 WL 653274, at *7 (W.D. Ky. Feb. 15, 2017) ("Should the Court exercise jurisdiction here, the Court would need to address three important issues of state law. The first deals with the definition of "occurrence" under Kentucky law and the terms of the policies.").

However, other federal courts have reached conclusions of federal law in the insurance realm, as is often required in similarly complex coverage disputes. *E.g. The Point/Arc of N. Kentucky, Inc. v. Philadelphia Indem. Ins. Co.*, 154 F. Supp. 3d 503, 507 (E.D. Ky. 2015) ("The Court must now consider under what circumstances, and pursuant to what legal standard, an insurer that has breached its duty to defend must indemnify its insured for the costs of settlement. Neither Kentucky courts nor the Sixth Circuit have addressed the precise question raised in this case."). This factor weighs slightly against exercising jurisdiction under the Declaratory Judgment Act but does not outweigh the important principle of efficiency in this case. However, the Court will take care to avoid creating scenarios in which findings of fact in the underlying actions are contradicted by factual findings here.

### Factor Five

Finally, the last factor addresses whether a more appropriate alternate remedy exists. Neither AWNAC nor WILD and Agrinational have addressed this factor. And here, it does not weigh strongly either way. "[T]he factors are not, of course, always equal." *Hoey*, 773 F.3d at 759. While it is possible state courts could address some of the issues raised in this proceeding, results in cases involving the same parties would vary. *Factual* issues that were definitively resolved or are in the adjudication process in the underlying actions should not be

-25-

determined here, however.  In summary, in the interests of efficiency and fairness, the *Grand Trunk* factors weigh in favor of a determination on the exclusion regarding AWNAC.

### B.    Indemnification

#### Burden:

"As a general matter, Kentucky courts have long recognized that an insurer that breaches its duty to defend will be liable to its insured for judgments and settlements obtained after that breach."  *The Point/Arc*, 154 F. Supp. 3d at 507 (citing *Interstate Cas. Co. v. Wallins Creek Coal Co.*, 164 Ky. 778, 176 S.W. 217, 219 (1915)).  But liability for each specific settlement is contingent on the terms of the policy to which the parties have agreed.  "To determine whether the claim is within coverage, one must look to the provisions of the indemnity agreement itself.  *Id.* (citing *United States Fidelity & Guar. Co. v. Napier Elec. & Const. Co.*, Inc., 571 S.W.2d 644, 646 (Ky. Ct. App.1978)).

In the insurance contracts at issue, the policy language provides that "[w]e will pay those sums that the insured becomes *legally obligated* to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."  [Record No. 70-5, p. 23]  In situations where policies contain "actual liability" language, "[t]he duty to indemnify is narrower than the duty to defend because it only arises when there is an *actual basis* for the insured's liability to a third party." *Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co.*, 598 F.3d 257, 269 (6th Cir. 2010).  *See also Martin Cnty. Coal Corp. v. Universal Underwriters Ins. Servs., Inc.*, 792 F. Supp. 2d 958, 960 (E.D. Ky. 2011), ("And here, Universal's policy does indeed make coverage contingent on CMS's actual liability—saying, much like the contracts in *Royal Indemnity* and *Barnes,* that Universal must "pay all sums the insured *legally must pay as damages.*") (emphasis in original); *Martin Cnty. Coal Corp. v.*

*Universal Underwriters Ins. Co.*, 727 F.3d 589, 594 (6th Cir. 2013) (citing *Ky. School Bds. Ins. Tr. v. State Farm Mutual Ins.,* 907 F.Supp. 1036 (E.D.Ky. 1995) ("[I]f an insured settles with a third party, but the insured would not have been actually legally liable to the third party, then the insurer does not have to indemnify the insured for having paid a settlement to the third party.").  The policy language here confirms that "actual liability," rather than "potential liability" serves as the governing standard for indemnification.

Although WILD and Agrinational vehemently disagree, they cite no Kentucky cases usurping this paradigm.  They mention *The Point/Arc*, but that case specifically carved out "potential liability" as a governing standard because it was contained within the operative insurance policy.  Stated differently, for the same reason *The Point/Arc* declined to adopt an "actual liability" standard post-hoc, the undersigned cannot adopt a "potential liability" standard contrary to the agreement the parties signed.  *Vance*, 730 S.W.2d at 524 ("The essence of our holding is that the coverage question will turn on the *true facts as judicially determined* and not on the claims of either party, or on the allegations of the complaint against the putative insured.")  However, the Court will adopt the continuous trigger test to determine when coverage was triggered under the policies for the reasons stated below.

### Trigger of Coverage:

"For purposes of triggering insurance coverage, the prevailing rule is that the time of the occurrence of an accident is when the complaining party was actually damaged or injured and not the time when the wrongful act was committed."  *Davis*, 495 S.W.3d at 162 (citing *Stillwell v. Brock Bros, Inc.*, 736 F. Supp. 201, 205 (S.D. Ind. 1990)).  There are various methods for determining when an injury is "triggered" for the purposes of coverage.  WILD and Agrinational advocate for the "continuous trigger" approach considering the progressive

and unorthodox nature of the alleged underlying pulmonary injuries. Wausau appears to contend the trigger should follow an "injury in fact" approach instead.

WILD and Agrinational again point to *Aetna Cas. & Sur. Co. v. Com.*, 179 S.W.3d 830, 841 (Ky. 2005), as a signal that Kentucky courts consider the continuous trigger approach. There, the Supreme Court of Kentucky allowed for the pro-rata distribution of damages over the course of multiple policy years. They also cite *St. Paul Guardian Ins. Co. v. City of Newport, KY*, as evidence that the Sixth Circuit has endorsed the concept of continuous harm in the malicious prosecution context. 804 F. App'x 379, 384 (6th Cir. 2020) ("[Every day he spent in prison, Mr. Virgil suffered from injury; obviously, wrongful imprisonment and the resultant physical and dignitary harms that accompany such confinement represent a continuous and ongoing injury."). Significantly, *St. Paul* illustrates that trigger of coverage in Kentucky turns on the facts and the specific policy of each case.

Wausau contends that the Court should adopt the same standard Kentucky uses in asbestos claims, but the cases it cites concern tort accrual and not trigger of coverage. *See Cap. Holding Corp. v. Bailey*, 873 S.W.2d 187, 195 (Ky. 1994) ("But until such time as the plaintiff can prove some harmful result from the exposure, albeit he need not prove he is already suffering from cancer, his cause of action has yet to accrue."); *Tomlinson v. Siehl*, 459 S.W.2d 166, 168 (Ky. 1970) ("The cause of action of the appellant husband for loss of consortium accrued simultaneously with the claim of the wife.").

Finally, WILD and Agrinational provide a noteworthy out-of-Circuit case involving similar facts. In *Polarome Int'l, Inc. v. Greenwich Ins. Co.*, 961 A.2d 29, 40–42 (N.J. App. Div. 2008), the court adopted a continuous trigger to claims alleging pulmonary injury from diacetyl exposure, the exact same injury as alleged in the underlying actions. It held that this

-28-

was a reasonable interpretation because the disease develops progressively and could not be traced to a single, exact moment. Based on Kentucky's fact-intensive trigger determination, and persuasive authority outside the Commonwealth, the Court will adopt the continuous trigger approach for the underlying claims. But this still leaves an unanswered question the parties will be directed to address: when applying the "continuous trigger" test in conjunction with the "actual liability" standard required under the policy and Sixth Circuit precedent, which settlements are implicated?

### V. Conclusion

Based on the foregoing, it is hereby **ORDERED** as follows:

1.      Plaintiff WILD Flavors, Inc. and Agrinational Insurance Company's motion for partial summary judgment [Record No. 67] is **GRANTED**, in part, regarding the number of occurrences and **DENIED**, in part, regarding reasonable defense costs, consistent with this Memorandum Opinion and Order.

2.      Defendant Allied World National Assurance Company's motion for summary judgment [Record No. 115] is **DENIED**.

3.      Defendant Wausau Underwriters Insurance Company's motion for summary judgment [Record No. 121] is **GRANTED**, in part, regarding WILD Flavors, Inc.'s "actual liability burden," but **DENIED**, in part, consistent with this Memorandum Opinion and Order.

4.      Further briefing is directed on two grounds as a result of the Court's finding that a breach of contract occurred:

(a)      The Court adopts the continuous trigger method for the purpose of evaluating trigger of coverage in the case. However, the parties are instructed to specifically brief the

Court regarding which settlements and costs must be indemnified under an "actual liability" indemnity standard in the insurance agreements, and a continuous trigger of coverage.

      (b)     Whether Kentucky law mandates a complete waiver of any challenge to defense costs when an insurer breaches its duty to defend and, if not, which costs are reasonable here.

      5.     The deadlines outlined in the Second Amended Scheduling Order [Record No. 63] are **SUSPENDED**.  Within 21 days, the parties are **DIRECTED** to file a limited brief addressing the two issues above.  Excess pages will not be allowed.

      Dated: October 20, 2025.

Danny C. Reeves, District Judge
United States District Court
Eastern District of Kentucky

-30-